RALPH K. MOORE and MILLIE P. MOORE, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent BLUE RIDGE TRANSPORTATION COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moore v. Commissioner
Docket Nos. 865-72, 866-72.
United States Tax Court
T.C. Memo 1977-275; 1977 Tax Ct. Memo LEXIS 169; 36 T.C.M. (CCH) 1103; T.C.M. (RIA) 770275; August 16, 1977, Filed Perry Shields and W.P. Boone Dougherty, *170 for the petitioners. Richard J. Neubauer, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Addition to Tax Petitioner
Year
Deficiency
Under Sec. 6653(b) [1]
Ralph K. Moore
1963
$12,320.19
$6,160.10
and Millie P.
1964
17,002.54
8,501.27
Moore [2]
Blue Ridge [3]
1963
19,712.26
9,856.13
1964
20,993.31
10,496.65
The following *171 issues remain for our decision: (1) Whether any part of the underpayments in income tax in each of the years in issue was due to fraud. (2) Whether Moore understated gross income for 1964 by an amount in excess of 25 percent. (3) Whether Blue Ridge is entitled to equipment rental deductions paid to Moore in excess of amounts allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Ralph K. Moore (Moore) and Millie P. Moore were husband and wife on the date the petition was filed and resided in Knoxville, Tennessee. They filed timely joint Federal income tax returns for the taxable years 1963 and 1964 with the district director at Nashville, Tennessee. Each return was filed on April 15 of the succeeding year. Petitioner, Blue Ridge Transportation Company, Inc. (Blue Ridge), is a corporation organized under the laws of the state of Tennessee.When the petition was filed Blue Ridge had its office and principal place of business at Knoxville, Tennessee. Prior to and during the years in issue Blue Ridge operated as an interstate carrier hauling primarily petroleum products within Tennessee. Blue Ridge computes its *172 income under the accrual method of accounting. Blue Ridge filed its Federal income tax returns for the taxable years 1963 and 1964 with the district director at Nashville, Tennessee. At the time the deficiency notices were mailed to petitioners on November 19, 1971, the period for assessment of an income tax deficiency for 1963 against the Moores and for 1963 and 1964 against Blue Ridge had expired unless fraudulent returns were filed. Section 6501(c)(1). Similarly, the period for assessment of a deficiency for 1964 against the Moores had expired unless a fraudulent return was filed or unless gross income was understated by 25 percent. [4] Section 6501(e)(1)(A). Moore was born in 1915 in Washington County, Tennessee, a rural area approximately 100 miles from Knoxville. He graduated from Sulfur Springs High School in Washington County. Moore had no formal education beyond high school. In 1947, Moore purchased *173 one-half of the outstanding stock of Blue Ridge for $5,000 and moved to Knoxville where the corporation was located. Moore had purchased the stock without viewing the equipment, and upon arrival in Knoxville, found that the equipment and business were in worse condition than he had been led to believe. During 1963 and 1964, Moore, who was president of the corporation, owned 76.72 percent of the stock of Blue Ridge and his wife owned the other 23.28 percent. In 1969 Moore sold Blue Ridge's equipment and franchise to Highway Transport for $300,000. The corporate operations and rates were regulated by the Interstate Commerce Commission (ICC) and the Tennessee Public Service Commission (TPSC). Moore appeared before both the ICC and the TPSC in rate increase hearings. Blue Ridge operated approximately 30 trucks and 40 trailers and employed several drivers and shop personnel. The only persons who worked in the office were Moore and Luther G. Haskins (Haskins), Blue Ridge's bookkeeper. Blue Ridge's books and records included cash receipts and disbursements journals, purchases journals, a sales journal, general journal and accounts receivable and accounts payable ledgers. Haskins *174 was the only employee in the corporation's bookkeeping department and was responsible directly to Moore during the entire period of his employment. Haskins had authority over the books of Blue Ridge and made all decisions as to the proper entries for all transactions. All information for recording the transactions was furnished by Moore to Haskins. Moore was president of Blue Ridge during the entire period Haskins was employed by the corporation. Blue Ridge was, basically, a one-man operation in terms of management and that one man was Moore. Moore picked up Blue Ridge's mail, opened most of it and all of it which contained checks. Moore gave the checks to Haskins who prepared Blue Ridge's bank deposits to the extent of checks handed to him by Moore. Haskins also prepared checks issued by Blue Ridge but only Moore was authorized to sign the checks and no countersignature was required. During 1963 and 1964 Blue Ridge maintained an account with Park National Bank, Magnolia Branch. In 1964 Blue Ridge also maintained accounts with the Tennessee Valley Bank and the Volunteer State Bank. Blue Ridge's books and records contained a personal account for Moore entitled Account *175 No. 1130, Ralph K. Moore, Leased Truck Account (personal account). All of Moore's general expenses were paid by Blue Ridge and charged to his personal account. Credits to the personal account were from Moore's salary account, from amounts designated as rent due Moore for truck leasing, and from amounts furnished by Moore either directly to Blue Ridge or applied on Blue Ridge's liabilities. During 1963 and 1964 the following charges and credits to Moore's personal account were made in the corporate records: Charges:
1963
1964
Payments to Moore
$22,425.00
$32,672.78
Payments to others for
5,925.72
40,297.43 a
personal expenses of Moore
Personal expenses of Moore
14,693.94
3,536.21
paid through Blue Ridge's
Purchase Journal
Interest on Moore's note to
4,500.00
3,650.00
Blue Ridge
Charge for Freuhauf Tank
1,030.00
Proceeds to Moore on sale
19,500.00
of Blue Ridge tractors
Transfer from note account
9,233.06
Totals
$48,574.66
$108,889.48
Credits
Salaries - Officers
$ 4,719.92
$ 4,719.92
Purchased transportation
30,000.00
18,000.00
Proceeds receivable from
9,221.07 b
sales of Moore's personal
assets--transferred to
Blue Ridge
Payments on Blue Ridge notes
4,000.00
29,000.00
Cash Deposits
37,542.34 c
Transfer to note account
24,000.00
Misc. payment by Moore for
47.98
Blue Ridge
Totals
$47,940.99
$113,310.24
*176 Blue Ridge used a large number of truck tires in its business and prior to 1963 had purchased some tires from Park Oil Company (Park Oil), a distributor for Goodyear Tire and Rubber Company (Goodyear). During the latter part of 1962 or the early part of 1963, Blue Ridge became entitled to a discount on tires purchased directly from Goodyear. The discount resulted in a lower price than that paid by Park Oil. Consequently, a vice-president of Park Oil, B.M. Taylor, and Moore entered into an oral arrangement, at Taylor's *177 request, pursuant to which Blue Ridge would purchase tires from Goodyear and sell them to Park Oil. Blue Ridge purchased tires from Goodyear for $20,843.51 and $30,705.77 in 1963 and 1964, respectively. Blue Ridge deducted these amounts as tires and tube expenses. Blue Ridge sold tires to Park Oil for $17,369.27 and $40,627.49 in 1963 and 1964, respectively. [5] The sales were not reported by Blue Ridge as income. Moore received 24 checks during 1963 and 1964 in payment for the tires from Park Oil either by hand delivery from Taylor or through regular mail deliveries. The checks issued to Blue Ridge were not turned over to Haskins in contrast to the normal procedure and, thus, were not deposited in Blue Ridge's bank account. Instead, Moore cashed the checks at the Park National Bank, Magnolia Branch (Magnolia branch) or at the Hamilton National Bank, Burlington Branch (Burlington *178 branch) and received the proceeds in cash. Twenty-one of the checks bore the indorsement of Blue Ridge by Moore, followed by Moore's individual indorsement. The other three checks bore only the indorsement of Blue Ridge by Moore. The first Park Oil check cashed by Moore was check number 6937 in the amount of $3,423.43. The check was dated February 1, 1963, and was cashed on February 13, 1963, at the Magnolia branch. Although the bank did not usually cash checks payable to corporations, Noah Millsaps, the manager of the branch approved the check for cashing. The second Park Oil check cashed by Moore was check number 7632 in the amount of $2,533.80. The check was dated June 3, 1963, and was cashed between June 3, 1963 and June 6, 1963, at the Magnolia branch. When C. K. Lewallen who had replaced Millsaps as manager of the branch, became aware that Moore received cash for the check, Lewallen called Moore and requested that he return the cash. Moore did so and after the indorsement and bank stamps were obliterated, the check was returned to Moore. Lewallen required repayment because of the bank policy against cashing checks payable to corporations. Moore subsequently returned *179 check number 7632 to Park Oil which issued check number 7605 as a replacement. Check number 7605 was dated June 6, 1963, and was cashed by Moore at the Burlington branch of the Hamilton National Bank on June 7, 1963. Although the bank did not generally cash checks payable to a corporation, Howard Lewallen, manager of the Burlington branch directed Emily Fisher (Fisher), a teller, to cash check number 7605. On the basis of the initial authorization by Lewallen, Fisher cashed checks payable to Blue Ridge in the total amount of $45,027.11 during the years in issue. During 1963 and 1964 Moore also cashed checks payable to Blue Ridge from Park Oil through two other tellers at the Burlington branch in the total amount of $9,546.22.
During 1963 some of Blue Ridge's equipment was involved in accidents. Blue Ridge filed claims for losses resulting from those accidents and two checks were issued by Park Agency, Inc. (Park Agency) in the total amount of $3,596.68. Moore indorsed the checks individually and for Blue Ridge and received the proceeds. Park Agency applied an additional sum of $1,979.84 [6] against a debt owed to it by Citizens Realty Company, a corporation of which Moore *180 was president and a major stockholder. Neither the checks from either Park Oil or Park Agency nor the proceeds nor the amount credited to the Citizens Realty account were recorded in Blue Ridge's books or reported in its income tax returns. On May 30, 1964, Blue Ridge paid $11,000 on an obligation of Moore to International Development Fund (IDF). The amount was charged against Moore's personal account. In June 1964, Blue Ridge borrowed $11,000 from Haskins and gave him a note for that amount. On October 2, 1964, Moore received a refund of $6,500 from IDF. The refund was applied to Blue Ridge's liability to Haskins and credited to Moore's account. Blue Ridge's balance of earnings and profits was $168,797.71 and $167,354.42 at the beginning of 1963 and 1964, respectively. The earnings and profits were sufficient to pay dividends to Moore in the amounts of $22,945.81 and $40,627.49 in 1963 and 1964, respectively. The income tax returns for the years in issue for both Blue Ridge and the Moores were prepared by Keith G. Sherrod (Sherrod), a certified *181 public accountant. Blue Ridge's returns were prepared by Sherrod from the books of Blue Ridge which were furnished by Haskins. The Moores' returns were prepared from information furnished by Moore and Haskins. Neither Sherrod nor Haskins was aware at any time during 1963 and 1964 that Moore cashed checks issued by Park Oil and Park Agency to Blue Ridge. Haskins did not learn about the checks until July 1966, and Sherrod did not learn about them until September 1967. Millie sued Moore for divorce in October 1963 but the action was dismissed on February 10, 1965. Millie was, however, granted a divorce from Moore on June 23, 1972. At no time did Millie attempt to tie up Blue Ridge's bank account. The following equipment was rented by Moore to Blue Ridge during the years in issue. Depreciation
Date
Depreciable
Claimed Prior Item
Acquired
Cost
Salvage
Basis
to 1/1/63
Trailer
1/7/52
$ 3,734.59
$ 300.00
$ 3,434.59
$ 3,434.59
Trailer
1/7/52
3,734.59
300.00
3,434.59
3,434.59
Tractor M-32
11/30/53
9,656.28
500.00
9,156.38
9,156.28
Tractor M-33
5/1/54
8,475.33
500.00
7,975.33
7,975.33
Tractor M-34
12/1/54
8,475.32
500.00
7,975.32
7,975.32
Tractor M-60 a
3/28/58
11,873.92
1,500.00
10,373.82
8,212.74
Tractor M-35
8/15/58
1,250.00
100.00
1,150.00
1,150.00
Trailer
1/10/63
1,562.40
200.00
1,362.40
$48,762.43
$3,900.00
$44,862.43
$41,338.85
*182 Blue Ridge paid and deducted as rent expense $30,000 and $18,000 in 1963 and 1964, respectively. Respondent disallowed amounts in excess of $10,000 in each year. OPINION The first and primary issue for our determination is whether any part of the underpayments of tax of either Blue Ridge or Moore was due to the filing of false or fraudulent returns. Since the notices of deficiency were mailed more than 3 years after the filing of petitioners' returns for the years in issue, assessment of the deficiency is barred unless the returns were false or fraudulent within the contemplation of section 6501(c)(1). [7] Additionally, if the returns were fraudulent, the penalty provided by section 6653(b) will be applicable. The existence of fraud is a question of fact which must be ascertained upon an evaluation of the entire record. Stone v. Commissioner,56 T.C. 213, 224 (1971). *183 It consists of an intentional wrongdoing designed to evade a tax believed to be owing. Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939). The burden is on the respondent to prove the existence of fraud by clear and convincing evidence. Section 7454(a); Rogers v. Commissioner,111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938); Estate of Clarke v. Commissioner,54 T.C. 1149 (1970); Stratton v. Commissioner,54 T.C. 255, 284 (1970). This burden may be met with circumstantial evidence. Powell v. Granquist,252 F.2d 56, 61 (9th Cir. 1958); Gajewski v. Commissioner,67 T.C. 181, 200 (1976), on appeal (8th Cir. May 23, 1977). Such evidence includes conduct calculated to conceal or mislead. Gajewski v. Commissioner,supra;Beaver v. Commissioner,55 T.C. 85, 92-93 (1970). Respondent's argument, which is premised on the theory that the fraud of a corporate officer and major shareholder will be considered the fraud of the corporation, proceeds as follows: Haskins, Blue *184 Ridge's bookkeeper had complete authority regarding accounting entries in the corporate books.Nevertheless, since Moore received all the corporate checks and ordinarily transferred those checks to Haskins who merely determined their accounting treatment, Moore controlled whether an item of income would be recorded. Moore knew that his failure to transmit a check would effectively prevent its entry in the corporate records. Consequently, Moore's failure to give Haskins the Park Oil checks, totaling $17,369.27 in 1963 and $40,627.49 in 1964, and his treatment of insurance proceeds from Park Agency in 1964 evidenced an intent to evade the tax on the income represented by those transactions by prohibiting their entry in the corporate records from which Blue Ridge's income tax returns were prepared. While some of the cash was returned to the corporation, Haskins was not told of its source, and the amounts were credited to Moore's personal account in accordance with the natural expectation of both parties. Petitioners argue that the evidence is insufficient to prove that the underpayments were made with the intent to avoid taxes believed to be owing. Petitioners argue that Moore's failure *185 to have the proceeds from the aforementioned transactions recorded on Blue Ridge's books was due both to his ignorance of accounting procedures which led him to believe it was a wash transaction which did not require recording, and to a fear that his wife, who was suing him for divorce, would tie up the company's bank accounts thereby depriving it of needed liquid capital. Finally, it is asserted that he never appropriated the proceeds for himself but merely held them for the company's benefit and eventually returned such funds during 1964. Turning first to Moore, we find that respondent has proven by clear and convincing evidence that Moore's underpayments of Federal income taxes for 1963 and 1964 were due to his filing false or fraudulent returns with intent to evade tax. Several factors lead us to this conclusion. One factor is the unusual manner in which the transactions in question were handled.The standard office procedure for Blue Ridge was for Moore to open all mail containing checks, collect these, and hand them over to Haskins who recorded them in the company's books and deposited them in its bank account. Moore relied on Haskins to record such funds and was clearly *186 aware that Haskins needed to see all income and expense items to record them properly. But Haskins saw none of the 24 checks received from Park Oil or the check from Park Agency, nor was the subsequent credit by Park Agency to Citizens Realty reflected on Blue Ridge's books and records or income tax return. Moore received these checks and personally cashed them (generally at a bank where Blue Ridge did not have an account) retaining the proceeds rather than depositing them in the company's account. When the cash was returned to the corporation, it was given to Haskins under circumstances where it was clearly expected the amounts would be credited to Moore's personal account. In signing these checks Moore usually used the Blue Ridge bank stamp which was kept and used by Haskins, yet neither Haskins nor Sherrod, who prepared the tax returns for both Blue Ridge and Moore, knew of the existence of these checks. Furthermore, the 24 checks received from Park Oil in 1963 and 1964 were treated differently from the Park Oil check received in an identical transaction in 1966. The latter check was brought to Haskins' attention, recorded on Blue Ridge's books, and deposited in its bank *187 account. We view Moore's activities as evidence of conduct calculated to conceal the receipt of income by arranging "affairs to avoid making the records usual in transactions of the kind." Spies v. United States,317 U.S. 492, 499 (1943). Moore argues that the failure to disclose the receipt of these funds evidences his inability to effectively communicate rather than any fraudulent intent. However, we do not find this reasoning convincing. While the evidence demonstrates his lack of capacity for small talk and personal conversation, he demonstrated sufficient communicative ability to successfully run a business and to appear before state and Federal regulatory agencies in rate increase hearings. Nor is there any evidence that his inability to effectively communicate ever prevented him from giving Haskins sufficient information to properly record corporate transactions either before or since the transactions in issue. The very number of checks handled by Moore in this unusual manner, and the fact that only these checks were so handled, demonstrate that his conduct was intentionally calculated to conceal the existence of the Park Oil and Park Agency checks. *188 A second factor we consider significant is the events surrounding the cashing of the checks. Moore took the first Park Oil check to the Park National Bank where Blue Ridge had its account. To receive cash for the check, which designated Blue Ridge as payee, he needed the approval of the branch manager. After the second check was cashed there he received a call from the new branch manager asking him to return the funds. It was not the bank's policy to give cash for checks made out to corporations without authorization of the board of directors. Moore gave back the money and received his check which was so badly defaced he returned it to Park Oil for a replacement. The other checks were then cashed at the Burlington branch of the Hamilton National Bank where Blue Ridge had no account. [8]
The difficulties he encountered in cashing these checks must have made Moore aware, if he was not already, that his treatment of these checks was highly irregular. His statements in court that he did not consider the funds from the checks as having anything to do with *189 Blue Ridge are all the more incredible in light of his difficulties which stemmed from the fact that everyone who knew about the checks treated them as having everything to do with Blue Ridge. Also, his continued efforts to obtain cash directly from the banks rather than, as was the normal practice, by giving the checks to Haskins to deposit in Blue Ridge's account and then withdrawing them from there, are evidence of a conscious effort to prevent the recordation of such funds on the company's books. In response to these conclusions it is asserted that where approval is given by the bank manager, it is not against local banking rules to cash corporate checks. This contention simply emphasizes the deviation from routine procedure Moore followed in these transactions in contrast to the general policy normally followed. Four witnesses, who were employees of Park National Bank or Hamilton National Bank during 1963 and 1964, all testified that it was against their bank's normal policies to give cash for a check made out to a corporation. Although, as petitioners take great pains to point out, it was not prohibited where "special arrangements" were made, these arrangements were *190 rare. Millsaps, who was a branch manager for Park National Bank during part of 1963, testified that the bank normally required a resolution from the corporation's board of directors before making such an exception. His successor in that position, Carl Lewallen, could not remember ever having seen such a resolution. It was he who asked Moore to return the cash he had received because the cashing of a corporation's check in that manner was against bank policy. Both tellers from Hamilton National Bank similarly testified that cashing a check with a corporate payee violated their bank's policy. They could remember only one other individual for which an exception to this policy was made. Moore's obtaining cash for checks payable to Blue Ridge was against the normal policy of both banks, and was only permitted because of the exception which two of three branch managers were willing to make for him. Further, we believe he was aware of this because he had to obtain prior permission from bank managers before he cashed checks at their banks, and because of the incident involving the second Park Oil check when he returned the proceeds he obtained in violation of normal banking policy. *191 A third factor we consider relevant is the series of explanations offered by Moore to investigating Internal Revenue Service agents. When Dickerson questioned him in July 1966, Moore first said that the cash deposits which were credited to his account during 1964 came from "an accumulation of cash, personal savings." Later, apparently while discussing the Park Oil checks, Moore stated that he was unsure of the source of the cash and wanted to reconsider the question. During September 1967, Meyers asked him about the Park Oil checks and he replied that he considered it a dollar swapping deal which did not produce income and therefore need not be reported on the company's books. Moore was also noncommittal as to whether he actually cashed the checks stating that he could not remember definitely whether he had. It was not until later that Moore described the transactions as an attempt to hide money from his spouse because of their marital troubles. Petitioners argue here that the testimony as to what was said was equivocal, that the statements were not inconsistent, and that the agents probably could not understand what Moore was trying to say because of his inability to express *192 his thoughts clearly. While Moore's statements are not completely contradictory, they do cast considerable doubt on his credibility. Moore claimed in 1966 and 1967 that he could not remember cashing the Park Oil checks in 1963 and 1964, yet considering the number of checks involved (24), the unusual nature of the transaction, the extraordinary way the checks were handled, the considerable amount of money involved, and the trouble he experienced with the second check we find it hard to accept his failure to recall these transactions. We also note that on neither of these occasions did he mention his previous marital problems which he offered at trial as the motive for his irregular handling of the checks. Petitioners also imply that these statements are irrelevant since the issue of fraud depends on the intent at the time the returns were filed and not at a later date. Gleis v. Commissioner, 24 T.C. 941 (1955), affd. per curiam 245 F.2d 237 (6th Cir. 1957). But such statements are relevant as bearing upon the credibility of Moore and the truth of the explanation of his conduct that he has offered. A fourth factor which we consider important is *193 our evaluation of Moore's credibility as a witness. This evaluation was based in part on our personal observation of him during the course of the trial. [9]
The core of Moore's defense is his assertion that ignorance of financial transactions and an inability to communicate led him to believe that the transactions were dollar swapping.Moore was financially unsophisticated but a shrewd enough businessman to realize that it was the corporation's dollars that were being swapped. His claim that he returned the money to the corporation, and his belated assertion (in which we place no credence) that he was hiding corporate money from his wife, recognize that the money should have been deposited in the corporate *194 accounts. Additionally, Moore's business success and his understanding of the business exhibited at trial convinced us he was substantially better informed than he wished us to believe. One other factor which leads us to conclude that Moore acted fraudulently is the manner in which the transactions in question appear carefully orchestrated both to avoid discovery by Sherrod or Haskins who would report the proceeds as income on the company's books, and also to provide Moore's account with sufficient credits to match his heavy withdrawals. These transactions were orchestrated in a manner consistent with a theory of fraud and not with Moore's explanation that he feared his wife would tie up the company's liquid assets. Often during 1964, Moore cashed Park Oil checks and immediately gave Haskins substantially all the proceeds to be recorded in his personal account on the Blue Ridge's books. [10] The effect of this was to prevent these checks from being recorded on Blue Ridge's books without keeping significant amounts of proceeds from its bank account. If all he wanted to do was to keep money away from his wife, it was unnecessary for him to personally cash the checks at one bank *195 and give the proceeds to Haskins who would merely deposit them in Blue Ridge's bank account and credit Moore's personal account. Giving the checks themselves to Haskins would have been more normal since Haskins usually deposited the company's checks in its account. Moore's answer was evasive when asked why he never let Haskins cash these checks. The truth appears to be that he was hiding their existence from him to avoid questions that would have uncovered the source of those funds, and precluded their being credited to his personal account. *196 Similarly, in June 1964 Blue Ridge borrowed $11,000 from Haskins to meet current operating needs while Moore was out of town. Moore had money from the previously withheld checks to meet these cash needs, yet he incurred interest expense rather than disclose its existence. Finally, it should be noted that these funds were returned to the corporation and, upon receipt, credited to Moore's personal account during a period when he was making heavy withdrawals. In fact, if not for these credits, his personal account would have been in the red by a substantial amount. [11] Moore argues that "Unknown to him at that time, the bookkeeper was incorrectly crediting these funds to the Petitioner's personal account." We observed both Moore and Haskins carefully, and on the basis of the entire record we are wholly unwilling to believe this was merely a happy coincidence. We believe Haskins did exactly as Moore expected him to do, and that Moore was aware of it. We interpret it as part of a plan to inflate Moore's personal account with corporate profits not recorded on the corporation's books. *197 We find the cumulative weight of these factors to have established Moore's fraud by clear and convincing evidence. One final defense raised by petitioners is that, since Moore, as a majority stockholder and corporate officer of Blue Ridge, was under a fiduciary duty under state law to repay any misappropriated funds, he received no net benefit by virtue of the credits made by Haskins to his account. However he admits that this defense is based on the contention that the bookkeeping entries were made by virtue of his innocent mistake. As we have previously rejected this contention, it follows that Moore did receive taxable income despite his legal duty to repay the corporation for his improper gain. Dawkins v. Commissioner, 238 F. 2d 174 (8th Cir. 1956), affg. on this issue a Memorandum Opinion of this Court. See Davis v. United States, 226 F. 2d 331 (6th Cir. 1955), cert. den. 350 U.S. 965 (1956). Our resolution of this issue relative to Moore moots the second issue as to the failure to report more than 25 percent of gross income for 1964. However, we note that our previously discussed conclusion that he did not hold the proceeds *198 from the Park Oil and Park Agency transactions for the benefit of Blue Ridge would support a finding for respondent here. With respect to Blue Ridge, we find that respondent has proven that a portion of its underpayments of Federal income tax for 1963 and 1964 was due to the filing of false or fraudulent returns with the intention to evade a tax known to be owing. The books of Blue Ridge reflected substantial purchases of tires during those years but the proceeds upon the sale of those tires were not recorded as income when received, but applied for Moore's benefit during 1964. Similarly, part of the proceeds from the Park Agency insurance compensation went directly to another of Moore's companies for his personal benefit and the remainder was indirectly applied for Moore's benefit. Since corporations act only through their officers, we impute the fraudulent handling of those transactions by Moore to Blue Ridge. American Lithofold Corp. v. Commissioner, 55 T.C. 904, 925 (1971). It is proper to do so even though, as here, there are other shareholders, where the dominant shareholder is personally involved in the fraud or where the agent is acting on behalf of *199 the corporation. See Ruidoso Racing Assn. Inc. v. Commissioner, 476 F.2d 502 (10th Cir. 1973), affg. a Memorandum Opinion of this Court. "[A] corporation can act only through its officers and * * * it does not escape responsibility for the acts of its officers performed in that capacity." Federbush v. Commissioner, 34 T.C. 740, 749 (1960) affd. 325 F.2d 1 (2d Cir. 1963). This brings us to the third issue for our determination: Whether Blue Ridge is entitled to equipment rental deductions for amounts paid to Moore in excess of that allowed by respondent. Moore owned and rented eight vehicles to Blue Ridge in 1963 and seven vehicles in 1964. The following are the amounts received by him (and deducted by Blue Ridge) and the corresponding amounts allowed by respondent as deductible by Blue Ridge: Year
Amount Paid
Amount Allowed
1963
$30,000
$10,000
1964
18,000
10,000 Respondent contends that an unreasonably excessive rental was dictated by Moore, the majority shareholder, to his captive corporation, while Blue Ridge's position is that the rental value fairly reflects the charges which would have been made *200 in an arm's-length transaction. Blue Ridge has the burden of proof on this issue, Rule 142, Tax Court Rules of Practice and Procedure, and seeks to carry that burden primarily through Moore's testimony. Moore testified that the rents charged were reasonable and were originally suggested by the Reconstruction Finance Corporation (RFC). He also stated that the equipment rented was used primarily as stand-by vehicles and that the rents were less than an independent rental company would demand. But he did not state whether he had in fact compared his rental figure with that of other companies or the basis behind his conclusion that the amounts charged were reasonable. Nor did he state when the RFC suggested the rental figure or the circumstances surrounding its estimate. It is possible that the rental figure, if made during an earlier year when the equipment was new and there were more vehicles would be entirely reasonable.
In challenging the claimed rental deduction, respondent points out numerous factors regarding the age and value of the equipment rented. The eight vehicles rented in 1963 had originally cost $48,762.43. Five of these vehicles, originally costing $34,076.11, *201 had been purchased between 1952 and 1954, inclusive. These same vehicles were rented in 1964 except for one which was sold for $7,000 during that year.The vehicle sold had originally cost $11,873.92 when purchased in 1958. Only two vehicles had not been depreciated down to their salvage value by 1963, and the total salvage value of the six so depreciated was $2,200. Judging from the age of the vehicles, their original cost, and the use to which they were put, we conclude that the deductions originally claimed are clearly unreasonable. The total rental fees charged for 1963 and 1964 almost equal the original cost of the vehicles, most of which were over 8 years old and had already been fully depreciated by Moore. Additionally, the vehicles were only used as standby equipment. In contrast to the claimed deduction, respondent's allowance of $10,000 per year appears well within reason. At that rate the owner could recover the entire original cost of the vehicle within 5 years--well within the 6 years over which Moore depreciated all but one of the vehicles and well within the actual life of the vehicles. Therefore Blue Ridge is entitled to deduct only those amounts allowed by *202 respondent as the fair rental value of the leased vehicles. Place v. Commissioner, 17 T.C. 199 (1951), affd. per curiam 199 F. 2d 373 (6th Cir. 1952), cert. den. 344 U.S. 927 (1953). To allow for concessions on other issues agreed upon by the parties, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect for the years in issue, unless otherwise indicated. ↩
2. Millie P. Moore is a party solely because she filed joint returns with her husband. The parties agree that Millie P. Moore is relieved of all liability for taxes, including interest and penalties, for the years in issue pursuant to secs. 6013(e) and 6653(b). Ralph K. Moore will hereinafter be referred to as Moore. ↩
3. These cases were consolidated because Ralph K. Moore and Millie P. Moore were the sole stockholders in Blue Ridge during 1963 and 1964 and the issues in both cases arise from the same facts.↩
4. On November 10, 1970, the Moores consented to extend the period for assessment of a deficiency for 1964 to December 31, 1971. If the consent had not been executed, the period of limitations under section 6501(e)(1)(A) would have expired on April 15, 1971.↩
a. na This amount includes $14,416.66 paid to the Bank of Knoxville and $11,000.00 paid to the International Development Fund. ↩
b. Reflected in these charges and credits is $6,932.62 paid on January 31, 1963, to Rodgers & Co. (apparently for a new car for Moore) and $5982.62 received by petitioners and transferred to Blue Ridge on the sale of Moore's Cadillac to Rodgers & Co.↩
c. This amount consists of cash transferred by Moore to Haskins to pay corporate debts. Although Moore did not indicate the source of the funds to Haskins, the amount reflects, in part, proceeds received by Moore from cashing the Park Oil checks that will be subsequently discussed.↩
5. The tires were sold by Blue Ridge to Park Oil at Blue Ridge's cost to Goodyear. Blue Ridge did not charge Park Oil more for the tires than Blue Ridge paid Goodyear. The difference between the payments by Park Oil to Blue Ridge and payments by Blue Ridge to Goodyear is not an issue in this case.↩
6. There is an unexplained difference of 2 cents between claims allowed on the accidents and payments to Blue Ridge.↩
a. This tractor was sold by Moore during 1964 for $7,000.↩
7. Respondent alternatively contends that absent fraud, section 6501(e)(1)(A), which extends the period of limitation to 6 years in the case of a 25 percent omission from gross income, will permit assessment of the deficiency for 1964 against Moore.↩
8. Even here he was required to obtain the branch manager's approval before obtaining cash for the corporate checks.↩
9. It is also based on certain aspects of his testimony we find evasive and inconsistent. For example, when asked whose money the Park Oil checks were he answered "It was the corporation's money." But when asked why he didn't tell Haskins or Sherrod about it he responded that "It didn't have any part to do with the business." To compound the inconsistency, Blue Ridge engaged in the same type of tire sale in 1966, but the proceeds were properly reported on the company's books.↩
10. Cash Deposits in Blue
Ridge's Account in 1964
Credited to Moore's Per-
Park Oil Checks Cashed
sonal Account (Account 1130)
by Moore in 1964
Checks
Checks Date
Amount
Dated
Cashed
Amount
2/11
$ 6,500.00
2/6/64
2/10/64
$ 249.23
2/6/64
2/10/64
3,969.37
2/6/64
2/10/64
4,193.14
3/13
7,000.00
3/9/64
3/13/64
1,953.22
3/9/64
3/13/64
3,50 0.00
4/3
1,276.34
4/17
2,300.00
5/1
7,350.00
4/14/64
4/28/64
2,265.49
5/15
5,000.00
5/12/64
5/14/64
2,544.90
5/12/64
5/14/64
2,353.56
6/15
2,400.00
6/12/64
6/15/64
2,476.92
8/14
3,116.00
8/7/64
8/10/64
8,116.90
9/16
2,600.00
9/14/64
9/15/64
3,643.20
10/12/64
10/15/64
2,868.80
10/12/64
10/15/64
2,492.76
An additional $5,000 was paid by Moore on Blue Ridge's note to the Tennessee Valley Bank on August 14, 1964.↩
11. None of the funds were returned in 1963, and the 1964 deposits in the company were credited to his personal account at a time when not only was Blue Ridge in need of funds, but Moore's capital account was very low. His withdrawals during 1964 amounted to $114,206.81 while deposits, including those attributable to Park Oil and Park Agency funds totaled $113,310.24. Moore benefited substantially from the manner in which these funds were handled and we do not believe that this was mere coincidence.↩